IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KAREEM AKEEM OLAJUWON, SR.,    )
                               )
            Plaintiff,         )
                               )
v.                             )        Civil Action No. 3:21-cv-4–HEH
                               )
DR. OFOGH, *et. al*,           )
                               )
            Defendants.        )

## MEMORANDUM OPINION
### (Granting Motion for Summary Judgment)

Kareem Akeem Olajuwon, Sr. ("Olajuwon"), a Virginia inmate proceeding *pro se*

and *in forma pauperis*, filed this 42 U.S.C. § 1983 action. The action is proceeding on

Olajuwon's Amended Complaint ("Complaint," ECF No. 22.) Olajuwon contends that

Defendants[1] provided him with inadequate medical care with respect to cancer in his

mouth in violation of the Eighth and Fourteenth Amendments during his incarceration in

the Richmond City Justice Center ("RCJC").

Although Olajuwon does not set forth clear claims, the Court construes his

arguments as the following claims for relief:[2]

---

[1] The Defendants are: 1) Dr. Kaveh Ofogh, "owner of Mediko" P.C., Inc. ("Mediko"); 2) Stuart Broth, DDS; 3) Dixie Delutis, Health Service Administrator, at Mediko; 4) Kyla Brown, RN, Mediko, Director of Nursing; 5) J. Womack, Lt, Mediko Liaison; and 6) Antionette Irving, Sheriff of the Richmond City Jail. Defendants R. Hunt and Dixie Delutis were dismissed as parties to the action by Memorandum Order entered on November 15, 2022. (ECF No. 68.)

[2] The Court employs the pagination assigned by the CM/ECF docketing system. The Court corrects the spelling, capitalization, and punctuation in the quotations from the parties' submissions.

Claim One:  Defendant Ofogh denied Olajuwon adequate medical care because as the owner of Mediko, he is the "final policy mak[er] over his employee[s] and is totally responsible for the medical decisions his employee[s] make." (ECF No. 22 at 4.)

Claim Two:  Defendant Broth "was deliberately indifferen[t] when . . . [he] fail[ed] to send Plaintiff out to a specialist and get a second opinion about the diagnosis of the Plaintiff['s] bloody mouth was gingivitis." (*Id.* at 5.)

Claim Three: Defendant Brown "was fully aware that Plaintiff . . . was being treated inadequate and deliberately indifferen[t] by dentist, Defendant Broth, whom repeatedly refused [his] request to send the Plaintiff to an outside specialist for a second opinion." (*Id.* at 5–6.)

Claim Four:  Defendant Womack as "medical liaison [is] suppose[d] to solve or bring about a solution to problems" but told Plaintiff that there was "nothing else medical can do." (*Id.* at 6.)

Claim Five:  "Defendant Irving allowed Plaintiff to stay in his housing unit for fourteen (14) months . . . without receiving adequate[] medical car[e]." (*Id.* at 6–7.)

Olajuwon asks for monetary damages and "an injunction . . . to surgically put teet[h] back in his mouth." (*Id.* at 8.) By Memorandum Opinion and Order entered on March 28, 2023, the Court dismissed Claim One. Subsequently, by Memorandum Opinion and Order entered on April 20, 2023, the Court dismissed Claims Four and Five. Thus, only Claims Two and Three remain before the Court.

The matter is before the Court on the Motion for Summary Judgment filed by Defendants Stuart Broth, DDS ("Dr. Broth"), and Kyla Brown, RN ("Nurse Brown") (collectively, "Defendants"). (ECF No. 41.) Olajuwon has responded. (ECF No. 84.) For the reasons set forth below, the Motion for Summary Judgment will be granted.

## I.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted).  When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)).  "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting

3

*Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants submit the affidavits of Dr. Broth (ECF No. 77-1) and Dixie DeLutis, RN (ECF No. 77-3); copies of grievances filed by Olajuwon (ECF No. 78); copies of Olajuwon's medical records (ECF No. 79); and an affidavit of Nurse Brown (ECF No. 82).

At this stage, the Court is tasked with assessing whether Olajuwon "has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Although Olajuwon filed a response to the Motion for Summary Judgment, it is not sworn to under penalty of perjury, and therefore, fails to constitute admissible evidence.[3]

---

[3] Olajuwon has been warned at least four times during the pendency of this action of the manner in which he must respond to a Motion for Summary Judgment. First, in the Court's July 15, 2022 Memorandum Order serving the action the Court explained:

> Plaintiff is advised that the Court will not consider as evidence in opposition to any motion for summary judgment a memorandum of law and facts that is sworn to under penalty of perjury. Rather, any verified allegations must be set forth in a separate document titled "Affidavit" or "Sworn Statement," and reflect that the sworn statements of fact are made on personal knowledge and that the affiant is competent to testify on the matter stated therein. *See* Fed. R. Civ. P. 56(c)(4).

Olajuwon also submitted many pages of medical records and grievances which he has annotated. However, Olajuwon fails to explain in his response, as he must, why these voluminous records defeat Defendants' Motion for Summary Judgment. *Cf. Walker v. Prince George's Cnty.*, 575 F.3d 426, 429 n.1 (4th Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))). Finally, Olajuwon submitted an unsworn Particularized Complaint. Olajuwon's failure to present any evidence to counter Defendants' Motion for Summary Judgment permits the Court to rely solely on Defendants' submissions in deciding the Motion for Summary Judgment. *See Forsyth*, 19 F.3d at 1537; Fed. R. Civ. P. 56(c)(3) ("The Court need only consider the cited materials . . . .").

In light of the foregoing submissions and principles, the following facts are established for the Motion for Summary Judgment. All permissible inferences are drawn in favor of Olajuwon.

## II.   UNDISPUTED FACTS

As a preface, the Court notes that the medical record in this action is lengthy because Olajuwon complained frequently and was seen often and treated for his complaints of bleeding gums. When Dr. Broth noticed that Olajuwon presented with abnormal bleeding, he immediately referred him to an oral surgeon. Olajuwon takes issue with the timing of Dr. Broth's referral to that specialist. However, despite his

---

(ECF No. 25 at 2.) Olajuwon received the same notice again by Memorandum Order entered on September 8, 2022. (ECF No. 38 at 2.) Subsequently, Olajuwon received a notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) reminding him of his obligations, with each dispositive motion filed by Defendants. (*See* ECF Nos. 74, 76.)

apparent dissatisfaction with the prescribed diagnosis and treatment, the record reflects that Olajuwon received a great deal of medical care for his dental concerns between November 2018 and October 2020.

### A.    Medical Care in 2018

Olajuwon had a history of high blood pressure, Type 2 diabetes, cardiovascular disease, and chronic kidney disease, amongst other ailments, and also smoked half of a pack of cigarettes a day. (ECF No. 79 at 11–13.) For six years, Dr. Broth was a third-party contractor dentist providing emergency dental care, including tooth extraction surgeries, for patients at the RCJC. (ECF No. 77-1 ¶ 2.)[4] Dr. Broth "managed direct dental care, including oral examinations, evaluations, assessments, diagnoses, and treatment for incarceration patients; prescribed pharmaceuticals and treatment regimens for the assessment of oral conditions; and coordinated the operations of the dental clinic at RCJC." (*Id.*) Dr. Broth "did not provide routine dental cleanings or preventative care." (*Id.* ¶ 3.) Dr. Broth is not a periodontist, and therefore, did not provide periodontal services for diseases affecting the gums. (*Id.* ¶ 4.) Instead, when Dr. Broth identified a concern that was outside the scope of his practice as a general dentist, the concern was relayed to the Health Services Administrator for a referral for services not provided at RCJC. (*Id.* ¶ 5.) Dr. Broth also had "no role in responding to inmate grievances and was not privy to any responses the medical or administrative staff

---

[4] The Court omits the secondary citations to the medical records in Defendants' affidavits.

provided to requests and/or grievances that [Olajuwon] presented to the medical staff." (*Id.* ¶ 39.)

Dr. Broth provided Olajuwon with emergency dental care numerous times during his incarceration in the RCJC. (*Id.* ¶ 16.) On July 31, 2018, Dr. Broth examined Olajuwon, and Olajuwon reported receiving no prior dental care. (*Id.* ¶ 17.) Olajuwon complained that he was experiencing bleeding gums on the lower right side and that he had been experiencing it for some time. (*Id.*) Dr. Broth recommend Olajuwon use Peridex mouthwash for 30 days to treat extensive gingivitis, or mild gum disease, and advised him to have a thorough dental cleaning as soon as possible. (*Id.*) Olajuwon was released from the RCJC on August 4, 2018, and therefore, the Peridex prescription was cancelled. (ECF No. 79 at 329.)

Olajuwon returned to the RCJC on November 25, 2018. (ECF No. 77-1 ¶ 18.) During his intake screening, Olajuwon reported a right broken molar. (*Id.* ¶ 19.) Olajuwon did not report any ongoing bleeding, pain, or any other dental concerns. (*Id.*) Similarly, during his chronic care appointment for hypertension and diabetes management on December 5, 2018, Olajuwon did not mention any problems with his right molar, gums, or mouth. (ECF No. 79 at 23–25.)

## B.    Dental Care in 2019

Dr. Broth saw Olajuwon again on January 22, 2019, for his complaints of bleeding and pain of the right lower molar. (ECF No. 77-1 ¶ 20.) Dr. Broth explained to "Olajuwon that tooth decay and extensive periodontal disease often present after years of poor and/or no dental hygiene," and also "emphasized the relationship between smoking

and periodontitis and the importance of taking medications as prescribed." (*Id.*) In response to Olajuwon's complaints, Dr. Broth "took x-rays, which revealed exposed roots and severe inflammation of tooth #30, . . . performed a cancer screening, which was negative" and revealed "no suspicious lesions or areas of concern to imply a cancer component or any more serious concerns." (*Id.* ¶ 21.) Dr. Broth "discussed the risks and benefits of extracting tooth #30, and Mr. Olajuwon agreed and consented to the procedure. The extraction was uneventful, and all bleeding stopped before he left the office." (*Id.*) Dr. Broth prescribed saltwater rinses and pain medications to address Olajuwon's concerns. (*Id.*)

On March 18, 2019, Olajuwon was seen in the chronic care clinic and reported no ongoing issues with the tooth extraction or with bleeding gums. (*Id.* ¶ 22.)

Dr. Broth saw Olajuwon a third time on July 2, 2019. (*Id.* ¶ 23.) During the appointment, Olajuwon complained for the first time that he had not fully healed and he had been experiencing bleeding gums since Dr. Broth extracted a tooth in January 2019. (*Id.*) Dr. Broth "examined the area and noted slightly reddish tissue but observed no active bleeding with pressure applied to the area." (*Id.*) Dr. Broth prescribed Peridex mouthwash at Olajuwon's request because he indicated that it had helped him in the past. (*Id.*)

On July 11, 2019, Olajuwon was seen in the chronic care clinic and made no mention of any ongoing bleeding concerns or other issues pertaining to the head, mouth, or neck. (*Id.* ¶ 24.) "This led [Dr. Broth] to believe that the Peridex had cured or at least significantly reduced the gum bleeding." (*Id.*) On July 24, 2019, Olajuwon was seen in

medical for an injured left foot, but he denied any other medical concerns at that time. (ECF No. 79 at 157.)

On August 26, 2019, Olajuwon filed a grievance stating that "the dentis[t] has messed my mouth up" and reported that he "continue[s] to bleed" and asked to see an outside dental provider. (ECF No. 78 at 1.) That same day, staff responded that his grievance would be forwarded to medical for a response. (*Id.*) On August 28, 2019, Olajuwon filed a second grievance, stating that he disagreed with the response to his initial grievance because he was bleeding and it was "quite painful" and "it's obvious[] that this den[tist] here can not stop the bleeding, therefore [he was] requesting to be seen by an outside professional." (*Id.* at 2.) On August 29, 2019, staff explained that they had just spoken with Olajuwon, and they were waiting for a response from medical staff. (*Id.*) On August 30, 2019, Nurse Brown advised Olajuwon to "submit a sick call for dental" and that "[t]he dentist will be able to make the recommendation for [his] follow up care." (*Id.* at 1.)

Dr. Broth saw Olajuwon again three days later, on September 3, 2019. (ECF No. 77-1 ¶ 25.) Olajuwon reported that "his gums bled periodically," but "[h]e denied constant bleeding and increased pain." (*Id.*) Dr. Broth "performed a cancer screening which was negative, and took x-rays, which revealed bone loss but no other abnormalities. However, the right lower molar (tooth #31) was very mobile, and – [he] suspected – the source of the occasional bleeding, and Mr. Olajuwon agreed to an extraction." (*Id.*) Dr. Broth noted that "[t]he procedure was uneventful, and no

9

additional bleeding resulted following extraction. Also, during the procedure [Dr. Broth] removed a small bone fragment from extraction site for tooth #30." (*Id.*)

Olajuwon returned for an exam on October 3, 2019. (*Id.* ¶ 26.) During the exam, Dr. Broth noted Olajuwon's complaint of gum bleeding dating back to January 22, 2019. (*Id.*) Olajuwon "claimed that the oral rinse [Dr. Broth] prescribed 'did nothing' and his mouth reportedly still 'constantly' bled following the extraction a month prior." (*Id.*) Olajuwon indicated that he wanted to be seen by an outside dentist for his periodontal disease. (*Id.* ¶ 27.) Dr. Broth "reviewed [Olajuwon's] medical records, which documented no evidence of severe bleeding based on a stable hematocrit level and A1c. Hematocrit is the percentage of red blood cells in the blood, and an increased or decreased level can indicate an ongoing blood disease or chronic condition." (*Id.*) Based on his review of Olajuwon's medical records, Dr. Broth explained to Olajuwon "that a referral to an outside provider was not necessary. He had repeat negative oral cancer screenings; no indication of any abnormal bone pathology on x-ray; and no other concerning findings." (*Id.* ¶ 28.) Dr. Broth "assessed [Olajuwon's] presentation as severe periodontal disease caused by a lack of prior dental care" and "[b]ased on [his] experience, education, and training, [he] believed the periodontal disease could be appropriately treated at RCJC and did not warrant an outside referral." (*Id.*)

On October 9, 2019, Olajuwon complained during his chronic care visit with the medical department that he "bleeds constantly from his gums." (ECF No. 79 at 31.) The examining physician's assistant noted that Olajuwon was "bleeding from right lower gum

10

at [the] site of dental extraction." (*Id.*) That same day, Nurse Brown ordered Olajuwon gauze for his mouth. (*Id.* at 33.)

On November 1, 2019, Olajuwon submitted a grievance alleging that he was "[b]eing denied adequate[] medical treatment by the den[tist], medical department, and the Sheriff." (ECF No. 78 at 3.) Olajuwon indicated that although the bleeding had resolved after a tooth was extracted in January 2019, he began to experience bleeding again in July 2019. (*Id.*) Olajuwon indicated that he was treated by the dentist in July, but that he submitted another sick request in September 2019 again for his bleeding. (*Id.*) Olajuwon indicated that the "special kind of mouth wash . . . ha[d] expired." (*Id.*) In response to the grievance, on November 4, 2019, Dr. Broth restarted Olajuwon on Chlorhexidine Gluconate oral rinse and ordered him a three-month supply. (ECF No. 79 at 359.) Nevertheless, Olajuwon continued to complain about bleeding gums throughout November. (ECF No. 78 at 4.)

C.   **Dental Care in 2020**

Dr. Broth saw Olajuwon again on January 2, 2020, for a re-evaluation and further treatment. (ECF No. 77-1 ¶ 29.) Dr. Broth examined Olajuwon and his "exam revealed no evidence of any pathology or unusual bone morphology." (*Id.*) Dr. Broth believed "[t]he primary source of bleeding appeared to be from oozing at the tooth #31 extraction site" but "there were no unusual pocket depths." (*Id.*) Dr. Broth explained that "[t]his was an unexpected and unusual presentation at three months post-extraction, and appeared pathologic in nature." (*Id.*) Dr. Broth informed Olajuwon that he "would order

an outside referral as soon as possible.  Mr. Olajuwon agreed to this plan and stated the

lower right tooth at position #29 felt loose."  (*Id.*)

On January 7, 2020, Olajuwon saw an outside oral surgeon who performed a

dental biopsy, and ordered antibiotics, ibuprofen, and saltwater rinses for Olajuwon.  (*Id.*

¶ 30.)  Dr. Broth saw Olajuwon in the hall a week later and told him that he had not yet

received the biopsy results but would let him know when he received them.  (*Id.* ¶ 31.)

Olajuwon informed Dr. Broth that "the bleeding had stopped for about three days

following the appointment but had since returned."  (*Id.*)  On January 16, 2020, Dr. Broth

met with Olajuwon to discuss his biopsy results which indicated that he had squamous

cell cancer of the mandible and explained the diagnosis, general prognosis, and shared

literature with him about the disease.  (*Id.* ¶¶ 32–33.)  Dr. Broth referred Olajuwon to oral

surgeons at the Virginia Commonwealth University Medical Center ("VCU") and to Dr.

Evan Reiter at the Massey Cancer Center.  (*Id.* ¶ 32.)

On February 4, 2020, Dixie Delutis inquired about the medications Olajuwon

should be taking based on his treatment plan.  (*Id.* ¶ 34.)  Dr. Broth spoke with Olajuwon

that same day before his appointment at the Massey Cancer Center and asked Olajuwon

to report back to him with which medications the doctors recommended so that he could

coordinate Olajuwon's care.  (*Id.*)

Thereafter, Dr. Broth did not see Olajuwon for approximately eight months.  (*Id.*

¶ 35.)  However, Dr. Broth was aware that Olajuwon had surgery at VCU in early April

of 2020 and returned to the RCJC on April 18, 2020.  (*Id.*)  On October 13, 2020, Dr.

Broth saw Olajuwon because his "oncology providers recommended a follow[-]up

appointment to discuss dental implants and restorative work." (*Id.* ¶ 36.) During his examination of Olajuwon, Dr. Broth "noted some right sided neck swelling around the surgical site described as a mandibular right resection, so [he] ordered a follow up visit at VCU, since the placement of implants is outside of [his] scope of practice." (*Id.*)

Dr. Broth explains that "[b]leeding gums often signal periodontal disease," and that Olajuwon "had a long history of periodontal disease, so his bleeding was unsurprising and seemed to resolve following the tooth extractions." (*Id.* ¶ 37.) Dr. Broth noted that, "[a]s soon as he presented with unexplained bleeding on January 2, 2020 . . . [he] immediately referred [Olajuwon] to an oral surgeon for biopsy and evaluation." (*Id.*) Dr. Broth explains that if he was "presented with the same or similar clinical circumstances today, [he] would not act differently" and that:

> Mr. Olajuwon had a history of human papillomavirus ("HPV") 16, documented by an outside lab. HPV 16 greatly increases the risk of throat an oral cancers. This increased risk likely contributed to Mr. Olajuwon developing [squamous cell carcinoma], but it still is an unlikely outcome considering multiple negative cancer screenings and on-and-off-again bleeding that resolved with extractions.

(*Id.* ¶ 38.)

### D.   Nurse Brown's Involvement as Administrator

From the record before the Court, it is apparent that Olajuwon submitted a great deal of grievances and appeals, but Nurse Brown only responded to a select few. (*See* ECF No. 78.) Nurse Brown served as Chief Nursing Officer ("CNO")/Director of Nursing ("DON") for Mediko, Inc. from July 2019 until December 2021. (ECF No. 82 ¶ 2.) In this administrative position, Nurse Brown monitored and evaluated medical and

nursing services for patients incarcerated in the RCJC.  (*Id.*)  From December 2021 to June 2022, Nurse Brown worked as the Health Services Administrator ("HSA").  (*Id.*)  As the HSA, Nurse Brown reviewed appeals of sick call requests and grievances.  Nurse Brown would discuss the results of the appeal with the patients and close the appeal.  (*Id.* ¶ 11.)  Nurse Brown "did not provide direct patient care and was not involved in Mr. Olajuwon's clinical course."  (*Id.* ¶ 16.)

Nurse Brown received appeals of Olajuwon's sick call requests and grievances, and she would discuss them with Dr. Broth.  (*Id.* ¶ 11.)  Each time Brown spoke with Dr. Broth, "he explained that Mr. Olajuwon had severe gingivitis.  Dr. Broth prescribed various oral rinses to try to remedy the problem.  Based on Dr. Broth's experience, education, and training, he believed the gingivitis could be appropriately treated at RCJC and did not warrant an outside referral."  (*Id.* ¶ 12.)  Brown "recall[s] responding to a few of [Olajuwon's] medical grievances and referring him to the dental provider for an examination."  (*Id.* ¶ 13.)  Specifically, on August 30, 2019, Nurse Brown recalls responding to a grievance appeal about Olajuwon's continued bleeding by advising him to submit a sick call request to be seen by the dentist so the dentist could examine him and recommend treatment.  (*Id.* ¶ 14; ECF No. 78 at 1.)

Brown explains that her "name appears only a few times in [Olajuwon's] clinical record, for issues related to vital signs and medication administration."  (ECF No. 82 ¶ 15.)  On October 9, 2019, Brown input an order for additional gauze for Olajuwon's gum bleeding at the request of the physician's assistant.  (*Id.*)

14

## III. ANALYSIS

### A.    Deliberate Indifference Standard

In Claims Two and Three, Olajuwon contends that Defendants violated his Eighth

and Fourteenth Amendment rights with respect to his dental care.  (ECF No. 22 at 3.)

From Olajuwon's submissions, it appears that he was a convicted felon at the time of his

complaints so the Eighth Amendment, not the Fourteenth Amendment governs his

claims.[5]  To survive a motion for summary judgment on an Eighth Amendment claim,

Olajuwon must demonstrate that Defendants acted with deliberate indifference to his

serious medical needs.  *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001).  A

medical need is "serious" if it "has been diagnosed by a physician as mandating treatment

or one that is so obvious that even a lay person would easily recognize the necessity for a

doctor's attention."  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson*

*v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

To survive summary judgment on an Eighth Amendment claim, an inmate must

demonstrate that (1) objectively the deprivation suffered or harm inflicted "was

'sufficiently serious,' and (2) subjectively the prison officials acted with a 'sufficiently

culpable state of mind.'"  *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998)

(quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  With respect to the denial of

---

[5] Olajuwon was convicted on May 20, 2019. (*See* ECF No. 42 at 6.)  The medical records show
that his first complaints to medical staff about his painful, bleeding gums were in October 2019.
(*See* ECF No. 42-1 at 31.)  Thus, Olajuwon was a convicted felon at the time.  Even if
Olajuwon's initial complaints began prior to his conviction, the deliberate indifference standard
would still apply. *See Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021) (citing *Martin v.
Gentile*, 849 F.2d 863, 870 (4th Cir. 1988)); *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021).

adequate medical care, "a prisoner must [demonstrate] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (quoting *Henderson*, 196 F.3d at 846).

The subjective prong requires the plaintiff to demonstrate that a particular defendant acted with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the

official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Moreover, "[i]t may not be seriously contended that any prisoner detained for however short a period is entitled to have all his needed elective medical care performed while in custody . . . ." *Kersh v. Bounds*, 501 F.2d 585, 589 (4th Cir. 1974). Jail facilities are "not constitutionally obligated, such as may be desired by inmates, to construct a perfect plan for dental care

17

that exceeds what the average reasonable person would expect to avail himself of in life outside the prison walls." *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).

### B.      Defendant Broth Was Not Deliberately Indifferent (Claim Two)

#### 1.      Timing of Referral to a Specialist

In Claim Two, Olajuwon complains that Dr. Broth "was deliberately indifferen[t] when . . . [he] fail[ed] to send Plaintiff out to a specialist and get a second opinion about the diagnosis [that] the Plaintiff['s] bloody mouth was gingivitis." (ECF No. 22 at 5.) Olajuwon suggests that "the delay in having a second opinion caused the long term bleeding to develop[] into 'cancer.'" (*Id.* at 3.) However, Olajuwon's conclusion is not based on any medical evidence, but simply based on his own opinion. The record clearly establishes that Dr. Broth addressed Olajuwon's complaints and treated Olajuwon in accordance with his medical expertise. As discussed in further detail below, although Olajuwon seemingly disagrees with the timing and course of care he received, this fails to demonstrate deliberate indifference on the part of the Defendants. Olajuwon fails to demonstrate that Dr. Broth subjectively recognized a serious risk of harm to Olajuwon and chose to ignore that risk.

As a preliminary matter, it is unclear whether bleeding gums amounts to a serious medical need.[6] Even assuming Olajuwon's bleeding gums amount to a serious medical need, the gravamen of Olajuwon's claim is that he disagreed with Dr. Broth's

---

[6] Clearly, squamous cell cancer of the mandible is a serious medical need. However, Dr. Broth was not deliberately indifferent to Olajuwon's diagnosis of cancer, and Olajuwon does not allege such.

professional decisions regarding the proper course of treatment with respect to his bleeding gums. However, mere "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state [a claim of deliberate indifference] unless exceptional circumstances are alleged." *Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). No such circumstances are alleged here. Instead, the record makes clear that Dr. Broth was entirely responsive to Olajuwon's many complaints about bleeding gums.[7]

Dr. Broth examined Olajuwon at least six times between July 2018 and January 2020 for his complaints of bleeding gums and provided a great deal of treatment for his symptoms. On July 31, 2018, Dr. Broth saw Olajuwon for his complaints of bleeding gums and diagnosed him with extensive gingivitis (mild gum disease), recommended Peridex mouth wash for 30 days, and advised Olajuwon to have a thorough dental cleaning as soon as possible, a service that Dr. Broth did not provide. (ECF No. 77-1 ¶¶ 3, 20.) Olajuwon was released from jail on August 4, 2018, but was reincarcerated in November 2018, and nothing in the record suggests that Olajuwon followed Dr. Broth's advice to have a thorough cleaning as soon as possible during that time. (*Id.* ¶ 18.) To Dr. Broth's knowledge, Olajuwon made no complaints about dental pain or bleeding gums from August 2018 to January 2019. (*Id.* ¶ 19.)

---

[7] To the extent that Olajuwon faults Dr. Broth for not responding to his grievances complaining about his bleeding gums or scheduling appointments, the record establishes that Dr. Broth was not responsible for responding to Olajuwon's grievances or sick call requests. (ECF No. 77-1 ¶ 39.)

Dr. Broth saw Olajuwon a second time on January 22, 2019, and his examination of Olajuwon revealed that Olajuwon had a long history of periodontal disease and tooth decay due to years of poor or no dental hygiene and smoking. Based on Olajuwon's condition, Dr. Broth found the bleeding unsurprising. (*Id.* ¶ 20.) Dr. Broth performed a cancer screening that was negative, ordered x-rays, which revealed exposed roots and severe inflammation of a tooth, and he and Olajuwon agreed that the tooth should be extracted. (*Id.* ¶ 21.) The extraction was uneventful, all bleeding stopped before he left the office, and Dr. Broth ordered him saltwater rinse and pain medications. (*Id.*) Olajuwon had a medical appointment on March 18, 2019, and reported no complications or bleeding gums. (*Id.* ¶ 22.)

Dr. Broth saw Olajuwon on July 2, 2019, for his complaints of bleeding gums. Dr. Broth examined Olajuwon and noted that he was not actively bleeding at the time. (*Id.* ¶ 23.) Dr. Broth ordered Peridex mouthwash because Olajuwon indicated that it had helped in the past. (*Id.*) During a follow-up visit on September 3, 2019, Olajuwon denied constant bleeding of his gums or any pain. (*Id.* ¶ 25.) Dr. Broth conducted a cancer screening which was negative and obtained more x-rays which revealed no abnormalities other than the previously reported bone loss. (*Id.*) Dr. Broth suspected a loose tooth was the source of occasional bleeding, and Dr. Broth and Olajuwon agreed that extracting that tooth would be best. (*Id.*) Once again, the extraction was uneventful, and the bleeding stopped. (*Id.*)

On October 3, 2019, Dr. Broth saw Olajuwon again for complaints of ongoing bleeding and, prior to the appointment, Dr. Broth reviewed Olajuwon's prior medical and

dental records which showed normal x-rays, bloodwork that showed no evidence of severe bleeding, negative cancer screenings, and no other concerning findings. (*Id.* ¶¶ 26–28.) Dr. Broth assessed Olajuwon's "presentation as severe periodontal disease caused by lack of prior dental care," and, in his professional opinion, Dr. Broth believed it could be treated at RCJC and did not warrant an outside referral to a specialist. (*Id.* ¶ 28.)

When Dr. Broth saw Olajuwon for reevaluation and further treatment three months later, on January 2, 2020, his exam still "revealed no evidence of any pathology or unusual bone morphology." (*Id.* ¶ 29.) However, because Olajuwon was experiencing bleeding in the form of "oozing at tooth #31 extraction site" even though "there were no unusual pocket depths," Dr. Broth found this to be "an unexpected and unusual presentation at three-months post-extraction" and immediately referred Olajuwon to an outside specialist. (*Id.*) By January 7, 2020, Olajuwon had already seen the oral surgeon and had a biopsy that day. (*Id.* ¶ 30.) On January 16, 2020, Dr. Broth met with Olajuwon to discuss his biopsy report that showed that Olajuwon had squamous cell cancer of the mandible and Dr. Broth referred him to an outside oral surgeon. (*Id.* ¶ 32.) At that point, Olajuwon was under the care of outside specialists at VCU. (*Id.* ¶ 35.)

As the record reflects, Dr. Broth was not deliberately indifferent to Olajuwon's complaints of bleeding gums. Dr. Broth explained that Olajuwon had periodontal disease and tooth decay from years of poor oral hygiene and smoking, and it was common for individuals such as Olajuwon to present with bleeding gums when they had severe periodontal disease from lack of dental hygiene. Dr. Broth treated Olajuwon according to

21

his medical judgment, and prescribed Olajuwon salt rinses, oral rinses, pain medication, and believed that the bleeding was coming from two loose teeth and extracted them. *See Owens v. Duncan*, 788 F. App'x 371, 374 (7th Cir. 2019) (holding that dentist's "decision to leave the incision to heal on its own was rooted in his medical judgment [and] [e]xercises of medical judgment are inconsistent with a deliberately indifferent state of mind" (citation omitted)). Although Olajuwon wanted to see a specialist earlier, Dr. Broth believed, in his professional opinion, that Olajuwon's periodontal disease could be appropriately treated at the jail, and he did not need a referral to a specialist. Absent exceptional circumstances which are not present here, the medical decision of whether to refer an inmate to a specialist generally fails to provide a basis for demonstrating deliberate indifference. *See Self v. Crum,* 439 F.3d 1227, 1232 (10th Cir. 2006) ("Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." (citing *Ledoux v. Davies,* 961 F.2d 1536, 1537 (10th Cir. 1992))). Moreover, even if Olajuwon disagreed with the prescribed treatment plan by Dr. Broth, he was not entitled to the medical care of his choosing. *Wright*, 766 F.2d at 849 (citations omitted); *see also Darby v. Greenman,* 14 F.4th 124, 129 (2d Cir. 2021) (explaining that a "disagree[ment] with [the dentist's] assessment of the severity of his condition and recommendation for treatment . . . constitutes, at most, a difference of opinion about the proper course of treatment; it does not demonstrate a deliberate indifference to a substantial risk of harm" (citation omitted)).

Dr. Broth averred that the multiple cancer screenings he conducted of Olajuwon's mouth were negative, and it was not until January 2, 2020, that Olajuwon presented with abnormal symptoms that gave him pause and, in his opinion, warranted an outside referral to a specialist. At that time, Dr. Broth immediately referred Olajuwon to see an oral surgeon, and Olajuwon had already seen the specialist and had a biopsy of his mouth a mere five days later. At most, Olajuwon complains of nothing more than a disagreement with Dr. Broth's professional medical opinion about the appropriate course of treatment, and its timing, and thus, he fails to establish a cognizable constitutional claim, much less deliberate indifference. *See Darby*, 14 F.4th at 129; *Wright*, 766 F.2d at 849; *see also Johnson*, 145 F.3d at 168 (explaining that even "[a] missed diagnosis . . . does not automatically translate into deliberate indifference" (citation omitted)).

In sum, Olajuwon fails to demonstrate that Dr. Broth acted with deliberate indifference to his bleeding gums or, as of January 2, 2020, to the abnormal healing of the extraction site. Olajuwon fails to demonstrate that Dr. Broth subjectively recognized a serious risk of harm to Olajuwon and chose to ignore that risk.

## 2.    Delay in Medical Care

To the extent that Olajuwon faults Dr. Broth for the delay in referring him to a specialist, he again fails to demonstrate any deliberate indifference. Olajuwon's symptoms reflected severe periodontal disease and tooth decay resulting from a long history of smoking and a lack of dental hygiene and care. It appears that Olajuwon wanted Dr. Broth to refer him to an outside specialist for his periodontal disease in October 2019. (*See* ECF No. 84-1 at 3–4.) However, in his professional judgment, and

23

after reviewing all of Olajuwon's prior dental and medical records, including his prior blood tests revealing no excessive bleeding, Dr. Broth believed that Olajuwon's periodontal condition could be treated at the jail. At that time and at any time prior, Olajuwon had not presented with any unusual symptoms that Dr. Broth believed warranted a referral to a specialist.

Nothing in the record shows that Dr. Broth should have known before January 2, 2020, that Olajuwon's bleeding gums involved an excessive risk of cancer. *See Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008) (finding no deliberate indifference where "[n]o evidence shows that [the doctor] suspected cancer or actually 'dr[e]w the inference' that [the inmate's symptoms] posed a serious medical risk" (citing *Farmer*, 511 U.S. at 837)). Dr. Broth explained that, as soon as he noticed something unusual in Olajuwon's mouth that did not present as severe periodontal disease, he referred him to an oral surgeon. Olajuwon saw the oral surgeon five days later, had a biopsy, and the results were back within nine days.

In sum, Olajuwon fails to demonstrate that Dr. Broth was deliberately indifferent to his complaints of bleeding gums, or the fact that, ultimately, he developed mouth cancer. Olajuwon received an extraordinary amount of dental care during his time in the local jail. Accordingly, Claim Two lacks merit and will be dismissed.

### C.   Nurse Brown was Not Deliberately Indifferent (Claim Three)

In Claim Three, Olajuwon contends that Nurse Brown "was fully aware that Plaintiff . . . was being treated inadequate and deliberately indifferen[t] by dentist, Defendant Broth, whom repeatedly refused [his] request to send the Plaintiff to an outside

specialist for a second opinion." (ECF No. 22 at 5–6.)  Olajuwon highlights the few

places Nurse Brown's name is mentioned in the record (*see* ECF No. 84-1 at 8 (signing

off on gauze provision); *id.* at 9 (telling Olajuwon to submit a sick call for the dentist); *id.*

at 11 (explaining to Olajuwon that only the dentist can make a referral); *id.* at 22

(indicating to Olajuwon that "providers are looking at treatment options for you")), but he

fails to explain how she was deliberately indifferent to his serious medical needs.  To the

contrary, to the extent that Nurse Brown was personally involved, the record reflects that

Nurse Brown was not deliberately indifferent to Olajuwon's ongoing complaints about

his bleeding gums.

     First, Nurse Brown served in an administrative role and she "did not provide direct

patient care and was not involved in Mr. Olajuwon's clinical course." (ECF No. 82 ¶ 16.)

Nurse Brown avers that, although she did not provide direct patient care and was not

involved with his treatment, many medical providers closely monitored Olajuwon's

concerns.  (*Id.*)  A supervisory medical administrator, like Nurse Brown "who lacks

medical expertise cannot be liable for the medical staff's diagnostic decisions." *Meloy v.*

*Bachmeier*, 302 F.3d 845, 849 (8th Cir 2002) (citing *Camberos v. Branstad*, 73 F.3d 174,

176 (8th Cir. 1995)).

     In her role as an administrator, Nurse Brown reviewed appeals of sick call requests

and grievances.  (ECF No. 82 ¶ 11.)  Nurse Brown had limited involvement with

Olajuwon.  Nurse Brown recalls responding to a few of Olajuwon's medical grievances

and referring him to the dental provider for evaluation.  (*Id.* ¶ 13.)  Nurse Brown would

receive appeals of Olajuwon's sick call requests and grievances and she would discuss

them with Dr. Broth. (*Id.*) Nurse Brown explained that each time she spoke with Dr. Broth "he explained that Mr. Olajuwon had severe gingivitis. Dr. Broth prescribed various oral rinses to try to remedy the problem. Based on Dr. Broth's experience, education, and training, he believed the gingivitis could be appropriately treated at RCJC and did not warrant an outside referral." (*Id.* ¶ 12.)

Olajuwon's disagreement with Dr. Broth's course of treatment for his gum bleeding does not establish that Nurse Brown acted with deliberate indifference to Olajuwon's dental needs by following Dr. Broth's orders or relying on his expertise. *See Miller v. Blue Ridge Regional Jail*, No. 7:17–cv–00161, 2018 WL 3341792, at *5 (W.D. Va. July 6, 2018) (finding no deliberate indifference of nurse or nonmedical personnel where inmate disagreed with offered course of dental care).

Rather, Nurse Brown was permitted to rely on Dr. Broth's expertise as a dentist and to assume, based on the many visits Olajuwon had with Dr. Broth and the great deal of treatment he received, that Olajuwon was receiving appropriate dental care. *See Meloy*, 302 F.3d at 849; *cf. Iko*, 535 F.3d at 242 (holding that once an inmate is placed in the care of appropriate medical personnel, "a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands" (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004))). Accordingly, Olajuwon fails to establish that Nurse Brown was deliberately indifferent towards his bleeding gums or any other dental treatment. Claim Three lacks merit and will be dismissed.

26

## IV.    CONCLUSION

The Motion for Summary Judgment (ECF No. 76) will be granted.  Claims Two

and Three will be dismissed.  The action will be dismissed.

An appropriate Order will accompany this Memorandum Opinion.

                                                            /s/
_____

                              Henry E. Hudson
                              Senior United States District Judge

Date: May 1, 2023
Richmond, Virginia